### In The United States District Court For The District Of Kansas

| | | |
|---|---|---|
| Dr. Robert Rodriguez, | § | |
|     Plaintiff, | § | |
|     v. | § | Case No. 6:24-CV-1221 |
| | § | |
| Hays Medical Center, Inc., | § | |
|     Defendant. | § | |
| | § | |

---

## COMPLAINT

COMES NOW Plaintiff Dr. Robert Rodriguez ("Dr. Rodriguez" or "Plaintiff"), and for his Complaint against the above-named Defendant, respectfully alleges as follows:

## JURISDICTION AND VENUE

1.　　Plaintiff brings this antitrust action pursuant to 28 U.S.C. §1331, and related Kansas statutory and common law.

2.　　Jurisdiction is conferred on this Court by 28 U.S.C. §§1331 which provide for original jurisdiction in this Court of all suits brought under the Constitution, laws, or treaties of the United States.

3.　　This Court has subject-matter jurisdiction over the remaining claims under 28 U.S.C. §1367.

4.　　This Court has personal jurisdiction over the Defendant because it resides and conducts its operations in this District.

5.　　Venue is proper in this Court pursuant to 28 U.S.C. §1391, because the events and circumstances alleged occurred in Ellis County, Kansas.

## PARTIES

6.    Plaintiff Dr. Robert Rodriguez ("Plaintiff" or "Dr. Rodriguez") is an individual who resides in Hays, Kansas.  He is a citizen of the State of Kansas.

7.    Defendant Hays Medical Center, Inc. ("Hays Med" or "Defendant") is a Not-for-Profit Corporation located at 2220 Canterbury, Hays KS 67601. Hays Med is a citizen of the State of Kansas.

8.    Hays Medical Center has ownership interests in the Hays Medical Center in Hays, Kansas.

## FACTUAL BACKGROUND

9.   Dr. Robert Rodriguez is a physician who is employed at Hays Medical Center.

10. Dr. Rodriguez is originally from Goodland, KS.  His father was in the army so his family traveled throughout the country and the world until Dr. Rodriguez was in fifth grade, at which time his father retired, and his parents decided to settle in Goodland Kansas, where the maternal side of his family resided.  He spent his middle school and high school years attending the public schools in Goodland.  He obtained all of his post-secondary education at the University of Kansas.  He was born in, grew up in, currently lives in and raises his family in Kansas.  And he hopes to die in Kansas.

11. Dr. Rodriguez wanted to be a doctor since he was in third grade.  He attended the University of Kansas for his undergraduate and Medical degrees, and he completed both his fellowship and residency at KU as well.

12. Dr. Rodriguez originally started an internship in family medicine—growing up in Goodland, that was the only medicine he knew.  But the excellent education he received at the University of Kansas, Medical Center showed him a much larger world. During his fourth year of medical school, he decided that cancer treatment was a better fit for him. He had had 6 family members who have been treated for cancer; four of whom died from the same condition.  And his undergraduate degree was in molecular biology, which created a perfect foundation for understanding and advancing the field of cancer medicine.

13. Dr. Rodriguez was offered exposition at the University of Kansas Medical Center as a hospitalist for the medical oncology inpatient service. This was the second most acutely ill patient population at the University of Kansas Medical Center, second only to the medical ICU.  There he took care of the most critically ill cancer patients without a single day of formal fellowship training.  This was an extraordinarily difficult task that even senior hospitalist that trained him in internal medicine were unable to complete.

14. During the two years that he worked as the only medical oncology hospitalist at the University of Kansas Medical Center, he won the only two teaching awards offered at the University of Kansas. These awards are highly coveted and very prestigious to the permanent attending staff at the University. He was also nominated and a finalist for the rainbow award, which is given on an annual basis and only awarded to those physicians who exhibit, the utmost compassion, teaching ability, and superior delivery of care in the entire facility. He was a finalist with two of his medical on oncology mentors who both had more than 30 years of clinical experience.

15. Upon completion of the two years of Hospitalist work, Dr. Rodriguez accepted a fellowship in medical oncology/hematology at the University of Kansas Medical Center. He was offered a position outside the match. This is highly unconventional, and it epitomizes his excellent reputation and care of patients at the University of Kansas. They typically have hundreds of applicants for two to three open positions annually. He was offered one of two open positions without applying because of the service he had provided to the University and his patients.

16. He was named chief fellow for both his second and third year of fellowship. This had never been done in the history of the program. This yet again showed the trust in his unique ability to provide excellent patient care and to lead his peers. Upon completion of his

Hematology/Oncology fellowship, he completed an additional year of training in genitourinary oncology. He completed that fellowship when the University had only one full-time attending physician and one part-time attending physician in the same discipline. He was the only physician in Kansas with that unique training outside of the Kansas City Metro area. Thus, the patients he treats with genitourinary malignancies in Hays were treated at the same level of expertise as is offered at the much larger academic center in Kansas City.

17. Although Dr. Rodriguez was offered multiple positions at the University of Kansas, he ultimately decided to return home to Goodland where his mother and half of his family lived.

18. Unfortunately, at that time starting a sub-specialty practice in a place as small as Goodland was an impossibility. So he decided to get as close to home as possible, and settled on Hays, Kansas. At that time, he felt that that would allow him to achieve his goals of providing care to those that he had taken care of throughout his lifetime. At the same time, he believed Hays offered the population needed to sustain a successful medical oncology practice, and that it would be beneficial taking all of his connections at the University of Kansas back to a smaller community hospital like Hays Med.

19. Desiring to take care of the people who took care of him, Dr. Rodriguez moved back to western Kansas, ultimately deciding to locate his home and practice in Hays.

20. He completed all his training in oncology/hematology in June 2015. Dr. Rodriguez started his employment in oncology/hematology at Hays Med on July 1, 2015 eager to change the landscape of western Kansas. He was hired as the third full-time hematologist/oncologist at Hays Med, with plans to expand the practice to four. But those plans rapidly changed when both of his longtime partners left the facility within six months of him starting.

21. One physician left for career advancement after she was offered a job at the University of Kansas Medical Center.

22. The other hematologist/oncologist left after 15 years of service at Hays Med because of direct conflicts with administration.

23. She uprooted her entire family and moved back to the Kansas City Metro area primarily because she was unable to work locally.

24. Dr. Rodriguez's next three years of employment at Hays Med were absolutely unbearable. During the three years of looking for new physicians to provide cancer services in western Kansas, only a single applicant applied, and he was from New York City. He interviewed on site and decided against taking the position.

25. The Hays Med administration was unable to recruit oncology/hematology physicians.

26. Dr. Rodriguez eventually decided to take matters into his own hands.

27. He returned to the University of Kansas Medical Center Fellowship, where he had completed his training, and he used his previous contacts and excellent reputation at the University to recruit Dr. Anthony Accurso. Dr. Accurso was a Kansas City native, born and bred. He signed a contract to work in Hays, Kansas.

28. Dr. Babu Prasad was the radiation oncologist at Hays Med for approximately 30 years. He retired two years into Dr. Rodriguez's time at Hays Med.

29. Dr. Rodriguez successfully recruited Dr. Matthew Mallory from the University of Kansas.

30. Dr. Rodriguez used his personal contacts and reputation to both recruit and successfully sign doctors to the positions described above because the Hays Med administration was unable to do so on their own.

31. After Drs. Rodriguez and Accurso built a successful practice at Hays Med, they were able add Dr. Isaac Chambers to their team approximately three years ago.

32. Dr. Rodriguez's ability to use his personal connections and excellent reputation allowed him to attraction and build the trust of physicians who

were not from Western Kansas. He was able to recruit these doctors to start a practice in rural America.

33. Eventually, Drs. Accurso and Mallory both left Hays Med because of direct conflicts with administration.

34. After nine years of employment at Hays Med, Dr. Rodriguez was forced to leave because he is no longer able to provide care for the patients in a way that he had established a standard at the facility in the past.

35. For example, it has been taking up to six weeks to get insurance prior authorization to initiate chemotherapy.

36. Also, it is taking three weeks to get CT scans done.

37. Furthermore, it is taking 3-4 weeks to obtain PET scans and MRIs.

38. These delays had never been the case at Hays Med before, and it is definitely not the standard of care at our larger institutions in Kansas.

39. Time is often a critical factor in cancer treatment.

40. Delays in obtaining tests or starting treatment can have a negative impact on patient outcomes.

41. Dr. Accurso leaving in July 2024 has left a medical vacuum that cannot be filled with locum physicians or mid-level providers.

42. Added to this, the Hays Med oncology/hematology practice has had great difficulty finding good quality, locum doctors to provide care in their facility.

43. This is evident in the events that happened in the summer of 2024. One of the doctors took extensive time off from the clinic starting on June 24, 2024 through July 28, 2024. He returned to work for a brief time and took additional time off from August 12 through August 31, 2024. Dr. Accurso was still employed in the clinic through June 2024. For 3 weeks of the aforementioned time periods, Dr. Rodriguez was the only physician working in a practice normally staffed by 3-4 medical oncologist/hematologist.

44. The stress and overwhelming nature of this task led Dr. Rodriguez to be evaluated in the emergency department because he was concerned that he was having a heart attack. Upon further medical work up, he was found to have an ulcer, most likely secondary to distress exhibited during that time he was left to provide medical services with less than ideal assistance.

45. Hays Med was able to find a local provider, Dr. Elliott, who was a new graduate from fellowship. He had completed his training at the end of June 2024. Dr. Elliott was an excellent man and cared deeply. But he had very limited clinical experience in taking care of clinical patients because he was an extensive research physician. He took the position to make extra money before starting a permanent academic position in Florida.

46. In Dr. Rodriguez's experience, the local providers in Hays Med's oncology department are either (a) post-retirement age looking to keep busy, (b) just starting their careers upon completion of their education, or (c) have a variety of personal/professional issues that prevent them from maintaining permanent employment elsewhere.

47. Either Hays Med administration was unable to identify suitable positions to work in the clinic or they did not have the desire to do so.

48. It was unacceptable leaving Dr. Rodriguez in such a precarious situation at great cost to both his physical and mental health.

49. Dr. Rodriguez's services include chemotherapy, surveillance of active long term cancer treatment, and surveillance of long-term hematologic diseases.

50. He is one of three total physicians that specialize in this type of medicine in western Kansas.  Dr. Rodriguez and one other physician provides care at Hays Med, and one other physician provides care in Garden City.

51. Dr. Rodriguez sees approximately fifteen cases per clinic day, and with an approximate case load of five thousand patients.

52. Dr. Rodriguez estimates that eighty percent of his patients reside outside Ellis County, but within the confines of the non-compete clause contained within Dr. Rodriguez's employment contract quoted below.

53. Dr. Rodriguez treats with chemotherapy approximately fifty percent of the patients needing his specialized care that visit Hays Med.

54. Dr. Rodriguez's treatment has saved the lives of numerous patients, both in the short and long term.

55. Unfortunately, cancer treatment can be a daunting and time-consuming task for patients.

56. Some types of cancer treatment require almost daily treatment.

57. In many cases, after the treatment the patient is not in a condition to operate a motor vehicle for several hours.

58. Some patients are lucky enough to be able to meet these demands. For example, recently one of the District Judge's in Kansas underwent cancer treatment. The nearest cancer treatment facilities were either Hays Med or Garden City—both of which were at least two hours from his home. Because of the frequency with which he needed to be treated and the length of the drive for each treatment, he decided to travel to another state and to remain there during his treatment. This required him to move cases off of his docket for a several week period. Had he had a job where he was unable to do this, his treatment would have been more complicated.

59. Some patients in similar positions are able to make the daily drive to Hays and have someone who can drive them back home. This takes a toll on patients and their families over the course of treatment.

60. Some patients will even choose to stay in Hays during the duration of their care.

61. But many patients are unable to take large blocks of time away from work or from their farm obligations and may not be able to receive the proper treatment or may have to delay treatment.

62. Similarly, patients who are unable to afford to travel long distances or to stay in a city that is too far away to drive to every day may either forego or delay treatment.

63. The likelihood of delaying or foregoing treatment increases the further a patient has to travel for care.

64. Patients who live west of Hays, for example, are more likely to obtain timely treatment if they only have to travel 1-2 hours to Hays, as compared to traveling 5-7 hours to Wichita or Kansas City.

65. Both treatment delay and failure to receive proper treatment can have negative impacts on patient outcomes, up to and including death.

66. On information and belief, at a meeting of the Board of Hays Med, they presented a graphic with a north-south line drawn through Hays. The area in Kansas west of that line is what Hays Med refers to internally as Western Kansas.

67. For the remainder of this Complaint, Western Kansas will refer to the geographic area described in the preceding paragraph.

68. There are simply just not enough oncology physicians to serve the areas in Western Kansas.

69. Dr. Rodriguez does not have a new patient opening until the middle of January 2025.

70. In Dr. Rodriguez's absence, these new cancer patients in Western Kansas will have to choose between waiting much longer than they should for the treatment of their malignancy or traveling to a facility further away.

71. Patients who are able to travel to more distant facilities will do so at additional out-of-pocket cost.

72. Most of these patients cannot (or should not) travel alone and will require family/friends for assistance in travel. This results in and lost work and lost funds to the family.

73. The definition of Western Kansas outlined above notwithstanding, there are few medical oncologist even west of Salina.

74. The option of traveling to larger metropolitan hospitals is not a good option for many patients.  Many western Kansas residents who seek care in Hays Med's cancer center are elderly and despise traveling to larger metropolitan cities.  Even after explaining to them that they would get diagnosed and treated at a faster rate in a larger city, many of them choose to stay locally because we provide physician-directed treatment without relying solely on nurse practitioners and physician assistants to make vital treatment decisions.  They gain comfort from knowing that any treatment change comes directly from Dr. Rodriguez even if he's on vacation.

75. For many of these elderly patients, Garden City is also not a desirable option because Garden City is only accessible by two-lane roads and many of these elderly patients would prefer to travel on the interstate with roads that are better maintained in treacherous weather.

76. Like most of the people who live in western Kansas, Dr. Rodriguez lives, and practices in western Kansas because he loves the community and feels a strong bond with both the members of the various locations he has worked in, but more importantly the relationship he has built with his patients over the years.

77. The physician-patient relationship in cancer treatment is a crucial part of treatment, for both moral and medical reasons.

78. Indeed, as a cancer physician, Dr. Rodriguez has developed a bond with his patients as they deal with one of the most difficult diseases in medicine.

79. During his time at Hays Med, Dr. Rodriguez has noticed troubling trends regarding the ability of Hays Med to provide the services needed for residents, as well as concerning treatment of physicians and staff.

80. By way of example, nearly twenty physicians and numerous staff members have departed the hospital over the past year.

81. When Dr. Rodriguez was hired, he signed an employment agreement with Hays Med ("the Agreement") that contained a number of clauses including a "restrictive covenant" ("the Covenant").

82. The restricted covenant in his 2018 Agreement stated:

> During the term of this Agreement, and for a period of
> two (2) years after Physician's employment by Hospital is
> terminated for any reason, either by Hospital or
> Physician, with or without cause, including the expiration
> of the term of this Agreement, Physician will not, within a
> one hundred and ten (110) mile radius in any direction
> from the city limits of Hays, Kansas, and within thirty
> (30) miles in any direction from the city limits of any
> other city or town where Physician performs services on
> behalf of Hospital under this Agreement, without the
> prior written consent of Hospital, engage in the practice of
> medicine, or directly or indirectly, own, manage, operate,
> control, be employed by, invest in, participate in, advise,
> consult with, or be connected with the ownership,
> management, operation or control of any entity engaged
> in the practice of medicine. Physician agrees that in
> addition to all other remedies otherwise available to
> Hospital, Hospital will have the right to injunctive relief
> to restrain and enjoin any actual or threatened breaches
> of this provision and that, if in any litigation that might
> arise over the provisions contained in this paragraph, a
> court should determine that the restrictions contained in
> this paragraph are too long in duration, or too broad in
> geographic scope to be enforceable in equity, such
> provisions as such court might find unenforceable are
> amended only so much as will be necessary in order for
> the restrictions contained herein to be enforceable and, as
> so amended, will be enforced by such court. Physician
> represents and acknowledges that Physician's experience
> and/or abilities are such that observance of this restrictive
> covenant will not cause Physician undue hardship and
> will not unreasonably interfere with Physician's ability to
> earn a living. The covenants and agreements contained in
> this paragraph will survive the termination of this
> Agreement for any reason.

83. In that 2020 amendment to the Agreement, the restrictive covenant was

amended by replacing the first sentence of the original Covenant with the

following:

15

During the term of this Agreement, and for a period of two (2) years after Physician's employment by Hospital is terminated for any reason, either by Hospital or Physician, with or without cause, including the expiration of the term of this Agreement, Physician will not, within a one hundred and ten (110) mile radius in any direction from the city limits of Hays, Kansas, without the prior written consent of Hospital, engage in the practice of medicine, or directly or indirectly, own, manage, operate, control, be employed by, invest in, participate in, advise, consult with, or be connected with the ownership, management, operation or control of any entity engaged in the practice of medicine.

84. Thus, after the 2020 Amendment, the Covenant now reads as follows:

During the term of this Agreement, and for a period of two (2) years after Physician's employment by Hospital is terminated for any reason, either by Hospital or Physician, with or without cause, including the expiration of the term of this Agreement, Physician will not, within a one hundred and ten (110) mile radius in any direction from the city limits of Hays, Kansas, without the prior written consent of Hospital, engage in the practice of medicine, or directly or indirectly, own, manage, operate, control, be employed by, invest in, participate in, advise, consult with, or be connected with the ownership, management, operation or control of any entity engaged in the practice of medicine. Physician agrees that in addition to all other remedies otherwise available to Hospital, Hospital will have the right to injunctive relief to restrain and enjoin any actual or threatened breaches of this provision and that, if in any litigation that might arise over the provisions contained in this paragraph, a court should determine that the restrictions contained in this paragraph are too long in duration, or too broad in geographic scope to be enforceable in equity, such provisions as such court might find unenforceable are amended only so much as will be necessary in order for the restrictions contained herein to be enforceable and, as so amended, will be enforced by such court. Physician represents and acknowledges that Physician's experience and/or abilities are such that observance of this restrictive covenant will not cause Physician undue hardship and will not unreasonably interfere with Physician's ability to

earn a living. The covenants and agreements contained in this paragraph will survive the termination of this Agreement for any reason.

85. The American Medical Association's Council on Ethics and Judicial Affairs discourages noncompete agreements in physicians' employment contracts.

86. The American Medical Association's Council on Ethics and Judicial Affairs has specifically found that restrictive covenants are unethical if they are excessive in geographic scope and duration in the circumstances presented, or if they fail to make reasonable accommodation of patients' choice of physician.

87. Due to the aforementioned developments at Hays Med, Dr. Rodriguez has submitted his resignation, giving a ninety-day notice.

88. Dr. Rodriguez has a strong desire to remain in western Kansas and provide the continuity of care that is a necessity for his patients. Put another way, if Dr. Rodriguez is not allowed to seek another position in western Kansas, nearly 5,000 individuals face severe risks and likely interruptions to their cancer management, placing their lives in jeopardy.

89. The non-compete clause that is the agreement would prevent Dr. Rodriguez from providing the continuing care his patients rely on to survive. This clause would prevent Dr. Rodriguez from providing medical services to nearly half of the state of Kansas, and more importantly, nearly no part of western Kansas. (Exhibit 1).

90. In other words, the prevention of Dr. Rodriguez from providing his services in western Kansas is likely to significantly reduce access to medical care in western Kansas, and more specifically may cost someone their life.

91. Hays Med focuses its efforts on Western Kansas because it knows that there is more competition if it seeks to develop its business east of Hays.

92. It specifically seeks to prevent competition, control prices, and minimize patient choice in Western Kansas.

93. For example, Hays Med CEO, Eddie Herman, has a regular interaction with the Hays Med staff referred to as " donuts with the boss."

94. On information and belief, during one of those sessions, one of the Hays Med employees asked Mr. Herrman what the plan was to keep Dr. Rodriguez employed at Hays Med.  As part of his response, Mr. Herrman stated that the 110-mile exclusion zone in the noncompete clause in Dr. Rodriguez's contract was necessary for Hays Med's business.

95. During another conversation about Dr. Rodriguez's noncompete, Mr. Herrman stated that the 110-mile radius of the non-compete was necessary to have a patient pool of 150,000 people in order to keep a practice intact.

96. Mr. Herrman further stated that if the noncompete was decreased to less than 110 miles that Hays Med would result in physicians owning hospitals similar to what happened in Great Bend.

97. On information and belief, Mr. Hermann specifically stated that Western Kansas was simply not big enough for two hospitals.

98. Put another way, Mr. Herrman believes that excluding doctors from providing services in Western Kansas in competition with Hays Med is necessary for Hay Med's survival.

99. Statements such as those by Mr. Herrman described above show a clear attempt to create a monopoly in oncology/hematology in Western Kansas.

100.   The market for medical care does not operate in the same manner as the typical retail market with sellers and buyers negotiating directly regarding price.

101.   Indeed, many patients and doctors do not even know the price of their treatment until several weeks after receiving it.

102.   In the case of patients with medical insurance, the insurance company negotiates prices with the hospital and the insurance company pays for the bulk of the services, after deductibles and co-payments are met.

103.   Many patients who have medical insurance do not even know the cost of their treatment until they receive a statement from the insurance company showing the amount that the hospital charges and the cost the insurance company negotiated for the service.

104.   In negotiating price for treatment, two of the important factors for insurance companies is the number of patients and the number of types of services offered by a hospital.

105.    If the hospital and the insurance company are unable to agree on a
negotiated price, then the hospital becomes "out of network" with that
insurance company.

106.    If a hospital is "out of network" for a particular insurance company,
then that insurance company's customers may decide go elsewhere for
treatment that is "in network."

107.    For a medical insurance company, one selling point is to be able to
show a large number of "in network" treatment providers, so that patients
know they will be able to be treated "in network" at their preferred
providers.

108.    Thus, a treatment provider who has few patients or few lines of
treatment is less of a loss to the insurance company if it goes "out of
network."

109.    Therefore, those treatment providers who have few patients or few
lines of treatment have less negotiating power when setting prices with
any particular insurance company.

110.    It is in that way that controlling a larger share of the patient
population and/or controlling where specialty services can be provided
offers larger treatment providers the ability to control prices through their
enhanced bargaining power with the insurance companies.

111.    Concentrating patients at larger treatment providers also benefits
insurance companies by allowing them to decrease the administrative

costs associated with frequent dealings with a larger number of smaller providers.

112.    As shown by Mr. Herrman's statements above, it is in that way that Hays Med conspires with, inter alia, medical insurance companies to control price and to control patients options in the market for oncology and hematology in Western Kansas.

113.    Many of the insurance companies involved are outside of Kansas.  On information and belief, Humana is based in Louisville, Kentucky; United Health Group is based in Minnesota; Ambetter is based in Kentucky; and the Blue Cross Blue Shield Association is based in Chicago.

114.    Thus many of the negotiations between Hays Med and insurance companies cross state lines.

115.    In addition, Dr. Rodriguez's practice includes patients from eastern Colorado and southern Nebraska.

116.    Dr. Rodriguez desires to practice west of Hays Med.

117.    If Dr. Rodriguez is allowed to practice west of Hays Med, then more of his patients will be from eastern Colorado and southern Nebraska, because the next large metropolitan hospital is in Denver.

118.    Both eastern Colorado and southern Nebraska also have a shortage for physicians, and especially hematologist/oncologist.

119.   In fact, if Dr. Rodriguez is allowed to move and practice in Western Kansas, he will likely draw fewer patients from the Hays area and more from eastern Colorado and southern Nebraska.

120.   A sample (Patients A through E below) of Dr. Rodriguez's cases shows the impact that delays in treatment or unavailability of services will have on patients in Western Kansas

121.   Patient A is from a rural area west of Hays.  She was diagnosed with a diffuse large B cell lymphoma. She was forced to ask family and friends for rides to the cancer center in Hays for treatment to receive chemotherapy, which is delivered for the first five days of a 21-day cycle and involves 6 cycles.  She had to travel extensively under great financial and social stressors. The family had limited means and family members were forced to take days off of work and one family member had to miss classes, to ensure that their loved one made it to treatment. The patient did not have a complete response (cure) and subsequently required radiation therapy.  This radiation therapy was daily, Monday through Friday, for a total of approximately 35 to 37 treatments. Because she was faced with a very difficult decision of attempting to cure her cancer but also further stressing the limited resources of her family, she made the decision to forgo radiation treatment, and "hope for the best."  Her disease returned a little over six months later and she passed. This patient was able to enjoy her family for about 11 months after diagnosis. These 11

22

months would have never been possible if she was forced to travel to a facility further away than Hays as the resources of her family were stressed to the absolute maximum levels.  Furthermore, had she been able to receive her treatments even closer to home, she may have been able to undergo the radiation treatment and enjoy a longer life.

122.    Patient B was also from a rural area west of Hays.  The cancer with which he was diagnosed is a terminal disease.  He was enjoying his normal life when he experienced new onset seizure activity.  The patient was sent to the local emergency department at which time he was diagnosed with a new mass.  The patient was sent to a larger metropolitan hospital, where he had life extending brain surgery to remove the primary mass.  But this is only a temporary solution. The patient would be placed on an oral chemotherapy called Temodar, which is given for the first five days of a 28 day cycle to be repeated for two years or until the patient expires.  These patients rarely make it past two years of life expectancy.  The larger hospital requested that the patient return for routine MRIs, neurological exam by a neuro-oncologist, and a toxicity check by medical staff.  The patient has young children in school and a wife with full-time employment outside the home.  They did not have the financial resources to travel to the larger hospital on a routine basis.  So his care was transferred to Hays Med.  Dr. Rodriguez has been taking care of this patient for approximately nine months, administering life

prolonging therapy. The patient inquired about having telemedicine appointments with the larger hospital physicians, but it would be impossible to perform the routine neurological exams needed over a computer screen. Without the care administered by Dr. Rodriguez, the patient would have likely expired by this time.

123.    Patient C also resides in a rural area west of Hays.  The patient has a type of cancer that is best treated at a multidisciplinary cancer center as a superior standard care has yet to be determined.  This patient was taken to a large metropolitan hospital and placed on a clinical trial.  The patient did not have the standard surgery that would greatly alter his daily quality of life, including likely impairing his ability to eat regularly, gain weight, and/or maintain the previous levels of activity after the surgery. The clinical trial used novel medications only offered at the larger hospital.  The patient did not require the life changing surgery previously mentioned. Typically, these clinical trial patients are required to follow up only at the larger hospital.  Dr. Rodriguez was able to see the patient throughout the clinical trial since he was trained under the primary investigator.  The patient was able to maintain his employment throughout the clinical trial, and therefore able to keep his insurance.  Dr. Rodriguez acted as the local primary investigator for the clinical trial while being overseen by the larger hospital clinical trial department. Without the ability of this patient to follow up locally and continue

working during the clinical trial, he would have lost his job and insurance and therefore his ability to receive life-saving cancer treatment.

124.    Patient D is also from a rural area west of Hays.  The patient's disease had progressed significantly despite standard treatments.  His life was in jeopardy, and he decided to seek a second opinion at larger metropolitan hospital.  During that evaluation by the best cancer institution in the world, the patient was told that Dr. Rodriguez's care mirrored the recommendations of their physicians.  Dr. Rodriguez's fellowship in GU oncology allowed me to stay up-to-date and administer the cutting edge treatments needed to treat this patient with complex medical needs.  The patient returned to his care and continues to be a patient today.  Despite receiving the standard of care, the patient's cancer has progressed to stage IV.  The patient continues to do relatively well.  Despite his prolonged disease state, the patient still has a terminal disease.  There will come a time when he is no longer able to travel for the treatment of his cancer care.  Without having a GU specialists in Western Kansas, the patient would not have access to the life prolonging therapy that has benefited this patient for nearly 10 years.

125.    Patient E is another patient from Western Kansas.  She had a common cancer that was very curable if found early.  Had she been diagnosed and begun treatment early, she likely would have had a complete remission of her cancer.  Unfortunately, because of the long distance she had to travel

to Hays, combined with her limited financial resources, she waited until the cancer had progressed to the point that a significant part of her body literally fell off of her before she came in for treatment. Her prognosis is now much worse since the cancer is very advanced. Had she had cancer care closer to her, her body would most likely still be intact and she would most likely be on a path the complete remission.

126. The patients described above are just a few examples of the detrimental effects that patients experience by not having readily available cancer treatment in Western Kansas.

127. Hays Med is worried about being able to maintain control of a market for cancer treatment in Western Kansas.

128. But these patients are worried about being able to receive timely and accessible treatment for diseases that can either kill them or dramatically affect their quality of life.

129. It is vital that patients in Western Kansas continue to have meaningful access to quality cancer treatment within a reasonable distance.

## COUNT I:
## SHERMAN ACT VIOLATION SECTION 1

130. The allegations in the above paragraphs are incorporated by reference.

131.   Any agreement that unreasonably restrains competition is unlawful under the Sherman Act, Section 1.

132.   Access to health care in rural America, and specifically in western Kansas, is currently under stress.

133.   Hays Med CEO Eddie Herman, on the Hays Med website, notes that they are a "leader in rural health across western Kansas."

134.   As a self-described leader in western Kansas, Hays Med has engagement with the following medical facilities:

   a.   Clara Barton Hospital

   b.   Cheyenne County Hospital

   c.   Minneola District Hospital

   d.   Decatur Health

   e.   Edwards County Hospital and Healthcare Center

   f.   Gove County Medical Center

   g.   Lane County Hospital

   h.   Logan County Hospital

   i.   Grisell memorial Hospital

   j.   Ness County Hospital

   k.   Norton County Hospital

   l.   Pawnee Valley Community Hospital

   m.   Phillips County Health Systems

   n.   Phillips county Health Systems

27

o.  Rawlins County Health Center

p.  Rooks County Health Center

q.  Rush County memorial Hospital

r.  Russell Regional Hospital

s.  Scott County Hospital

135.   Each of these facilities, save for two, are located west of Hays. The remaining two facilities receive little to no engagement from Hays Med.

136.   Further, Hays Med's own policy reflects a belief that Western Kansas, with respect to the health care market, is each of the respective counties located west of Ellis County.

137.   With respect to the care provided by Dr. Rodriguez, there are only three physicians who provide this care, with Hays Med employing sixty six percent.

138.   Upon information and belief, insurance payment rates are based on contractual negotiations between health insurers and hospitals.

139.   The leverage for hospitals, such as Hays Med, comes in their ability to provide a diverse number of services, with a higher volume.

140.   A reduction in either the number of services, or number of patients, reduces both bargaining power and payments rates from insurers to hospitals.

141.  Hays Med negotiates with its physicians and insurance companies, many of which are located in other states, to control prices for and availability of cancer treatment in Western Kansas.

142.  Hays Med's interest in binding physicians with non-complete clauses, such as the one applicable to Dr. Rodriguez, is to ensure physicians are unable to practice in other hospitals in western Kansas, ensure that Hays Med retains a larger number of patients and services, and thus a larger share of the market, resulting in higher bargaining power in the negotiation of insurance contracts.

143.  Hays Med, as noted *supra*, contains restrictive covenants. These covenants are extremely restrictive in nature, and effectively remove all ability for Physicians, or staff, who work at Hays Med to ultimately work or provide services in western Kansas after their employment.

144.  Effectively eighty percent of Western Kansas, as defined by Hays Med, is no longer available to Dr. Rodriguez.

145.  Western Kansas already has a significant dearth of providers, as illustrated by Dr. Rodriguez's case load and the low number of physicians (3 total) who provide the treatment that Plaintiff provides.

146.  A drain on health care has further strained medical accessibility. For example, over the past few years Hays Med has lost nearly twenty different physicians, Certified Registered Nurse Anesthetists, midlevel providers, and ancillary staff. None of which have remained in the region

29

and provide services to the residents of the western half of the state due to the restrictive covenants in their contracts with Defendant.

147.    Services impacts include cardiology, urology, orthopedics, OB/GYN, Hospitalists, oncology, nephrology and general family medicine.

148.    This, in addition to shrinking coverage from hospitals in Dodge City and Garden City, along with staffing issues in other facilities, heath care in Western Kansas will become increasingly difficult to find.

149.    Without these services, the residents of Western Kansas will be severely affected, and the toll is already beginning to show.

150.    Defendant Hays Med exercises excessive market power with respect to healthcare, and specifically for medical oncology and hematology in Western Kansas.

151.    Due to the sparse population and the distances at issues in Western Kansas the market power of Defendant Hays Med is amplified because it is impractical for patients to travel into other markets outside of the reach of the employment agreements of Defendant Hays Med to seek care.

152.    Many of the patients treated by Dr. Rodriguez are unable to seek care in larger metro areas such as Denver, Wichita or Kansas City. This is due to various factors such as health status, costs, or age to name a few.

153.    The employment agreement between Hays Med and Dr. Rodriguez restricts trade by restricting the amount of medical care, and specifically

oncology and hematology, that can be provided in the market of Western Kansas.

154.   The restraint of trade imposed by the employment agreement of Defendant Hays Med is unreasonable as described in more detail above.

155.   The employment agreement of Hays Med harms consumers in Western Kansas, *inter alia*, by restricting their choice of health care providers, specifically including oncology and hematology, increasing costs and decreasing quality due to the restrictions on consumer choice.

156.   The non-complete also restricts the ability of patients to choose the provider of their choice.

157.   By limiting this ability, the non-complete has detrimental impact on the consumers, i.e. patients of Dr. Rodriguez.

158.   This restraint not only limits their choice of physician, but also risks limiting their ability to continue necessary treatment, possibly placing the lives of individual patients at risk.

159.   Any interruption to treatment such as chemotherapy places patients in extreme jeopardy.

160.   The employment agreement of Hays Med harms Plaintiff, *inter alia*, by restricting his income, by restricting his choice of locations in which he may provide health care, and by decreasing his ability to compete in the healthcare markets of Western Kansas.

161. WHEREFORE Plaintiff prays for Order against the Defendants finding them in violation of the Sherman Antitrust Act Section 1; awarding damages in an amount to be determined at trial, including treble damages; finding that the Covenant unlawful; entering an injunction prohibiting Defendant from enforcing said covenant; and for any other relief this Court deems just and proper.

## COUNT II:
## SHERMAN ACT VIOLATION SECTION 2

162. The allegations in the above paragraphs are incorporated by reference.

163. Hays Med exercises or attempts to exercise monopoly power in the healthcare market, and specifically the oncology market, in Western Kansas.

164. In Kansas there are approximately one hundred and five physicians who provide hematology and oncology services.

165. Of those, only three are located in Western Kansas, as defined by Hays Med.

166. Of those three, two (or sixty-six percent) are currently employed at Hays Med.

167. Hays Med has intentionally and willfully acquired and maintained this monopoly power, *inter alia*, through its use of restrictive covenants in its employment agreements that unreasonably restrict competition and consumer access to surgeons and other healthcare professionals in the markets in which Hays Med operates.

168.   Hays Med uses its monopoly power to harm consumers by, *inter alia*, restricting their choice of healthcare providers, in this case oncology and hematology, as well as both increases consumer costs and decreasing service quality by restricting consumer choice and the ability of surgeons and other healthcare providers to compete in the markets in which Hays Med exercises its monopoly power.

169.   Hays Med, as in the case with Dr. Rodriguez, uses the non-compete clauses to ensure that physicians that otherwise would stay in the community, are unable to do so and thus must either uproot their lives and leave the community altogether or continue working at Hays Med.

170.   These covenants ensure that physicians such as Dr. Rodriguez who provide services to underserved communities, such as those in western Kansas, are unable to provide services at other locations, and that patients are unable to choose their desired health care provider.

171.   Hays Med further uses the Covenants as negotiating leverage both to unilaterally determine where physicians may or may not practice upon leaving Hays Med as well as ensure they retain market power for leverage in health insurance negotiations.

172.   For example, the CEO of Hays Med conveyed to a staff member that Hays Med "would never let Dr. Rodriguez out his non-complete."

173.    He has also indicated that Western Kansas is not big enough for two hospitals and that it is essential that Hays Med be able to control the market in Western Kansas to ensure that Hays Med has enough patients.

174.    As Hays Med is both one of the largest, and only, providers of healthcare services in Western Kansas, they have significant market power and further utilize the Covenants as bargaining tools to ensure Physicians do not have any ability to compete, as well as ensuring that other hospitals cannot compete for the service providers.

175.    Effectively, Hays Med uses these Covenants as leverage to ensure they control both where providers may work, as well as what providers the few other medical facilities in western Kansas may hire.

176.    Hays Med, as is the case with Dr. Rodriguez, uses the non-compete clauses to ensure that physicians that otherwise would stay in the community, are unable to do so and thus must either uproot their lives and leave the community altogether or continue working at Hays Med.

177.    Hays Med further uses the Covenants as negotiating leverage, to unilaterally determine where physicians may, or may not practice upon leaving Hays Med.

178.    As Hays Med is both one of the largest, and only, providers of healthcare services in western Kansas, they have significant market power and further utilize the Covenants as bargaining tools to ensure

Physicians do not have any ability to compete, as well as ensuring that other hospitals cannot compete for the service providers.

179. Effectively, Hays Med uses these Covenants as leverage to ensure they control both where providers may work, as well as what providers the few other medical facilities in western Kansas may hire.

180. Due to Plaintiff's attempt to unlawfully impose the Covenant, it has attempted to monopolize providers and the services they render.

181. Further, upon information and belief, Hays Med is experiencing significant financial distress.

182. Upon information and belief, Hays Med has, for various reasons, been exploring the possibility of entering into either a sale, merger, or other business relationship with another hospital system as it has been operating with negative returns for a number of years.

183. In order to get the best price possible, upon information and belief Hays Med is attempting to retain its providers, including physicians, nurses and other staff, in order to ensure it retains a larger value in the instance of a sale, or re-negotiation of its insurance payment rates.

184. Finally, Hays Med exercises its market share to influence the decisions and engagement of other health facilities in the area.

185. Upon information and belief, Hays Med communicated to a local regional hospital that they could either "work with Hays Med, or they would compete with Hays Med," indicating that if the hospital did not

engage in a manner satisfactory to Hays Med, that Hays Med would attempt to put them out of business.

186.    WHEREFORE Plaintiff prays for Order against the Defendants finding them in violation of the Sherman Antitrust Act Section 2; awarding damages in an amount to be determined at trial, including treble damages; finding that the Covenant is unlawful; entering an injunction prohibiting Defendant from enforcing said Covenant; and for any other relief this Court deems just and proper.

## COUNT III:
## DECLARATORY JUDGMENT

187.    The allegations in the above paragraphs are incorporated by reference.

188.    The Kansas Declaratory Judgment Act exists to allow judicial resolution to disputes and to provide certainty to the rights and obligations of parties to, among other things, contracts.

189.    The practices of Hays Med, as applied to Dr. Rodriguez and others, ensure that a shortage of physicians exists in western Kansas, and ensure that the Covenant used by Hays Med is contrary to the public interest and should not be enforced.

190.    A covenant that places an undue burden on a physician's right to practice medicine is unlawful and shall not be enforced.

191.    Further, a covenant that creates a shortage of physicians is injurious to public welfare.

192.    Hays Med's practices only seek to prevent employees from working at other

health care facilities. To state it another way, these Covenants are used to create somewhat of a monopoly and do not protect any legitimate business interests for the hospital.

193.    The covenants create a situation whereby rural physicians are unable to go anywhere else in western Kansas and eliminate broad swaths of Kansas altogether.

194.    As evidenced by available data, western Kansas already has a dearth of physicians able to provide the services Dr. Rodriguez provides.

195.    Enforcement of the covenant will remove 1/3 of all available physicians, and further reduce access to critical care services.

196.    Such a provision, in addition to being contrary to public policy and injurious to the public welfare, is unconscionable.

197.    The contract clause would deprive residents on the western half of the state of Kansas the ability to seek, and receive, necessary or urgent care.

198.    WHEREFORE Plaintiff prays for Order against the Defendants finding the Covenant no to complete is injurious to the public welfare, unconscionable, and void for public policy reasons. Plaintiff respectfully request the Court award damages in an amount to be determined at trial, including treble damages; find that the Covenant is unlawful; enter an injunction prohibiting Defendant from enforcing said covenant; and award any other relief this Court deems just and proper.

## COUNT IV:
## INJUNCTIVE RELIEF

199.    The allegations in the above paragraphs are incorporated by reference.

200.    Plaintiff is forced to seek an injunction in this matter.

201.    Plaintiff desires to seek employment at a facility in western Kansas. However, due to the unlawful restrictive covenant, he is unable to engage negotiations in good faith with other facilities that would seek to engage his services.

202.    Indeed, Plaintiff has sought to find a new place whereby he can provide the lifesaving treatment, including chemotherapy, to his nearly 5,000 patients. However, thus far he has been informed that the threat of litigation over the non-compete is a deterrent to proceeding forward with negations.

203.    By way of example, Hays Med has sued Tribune Hospital in another matter similar to Dr. Rodriguez's case, attempting to enforce a non-compete similar to Dr. Rodriguez's.

204.    In other words, Hays Med has illustrated both through representations made by the CEO, as well as its tangible actions, that it will engage in litigation to ensure Dr. Rodriguez will be unable to provide the necessary, lifesaving care his patients require, whilst also ensure patients of Dr. Rodrigues will no longer have their choice of physician.

205.    Therefore, Plaintiff must seek an injunction in this matter to ensure continuity of care in western Kansas.

206.    Plaintiff's claims provide a sound basis for this action and Plaintiff is likely to succeed on the merits.

207.    Plaintiff with suffer irreparable harm as western Kansas, and the nearly 5,000 patients who rely on Dr. Rodriguez's care, will be without access to a critical piece of health care infrastructure and a necessary health care provider, and will be unable to provide services such as chemotherapy.

208.    Dr. Rodriguez will be irreparably harmed as he will be unable to practice medicine in western Kansas and would be required to leave the state. Further his patients would be irreparably harmed as they would lose their care provider, and likely their ability to continue their life sustaining treatment.

209.    There is no harm to Defendant if Dr. Rodriguez is allowed to continue to practice medicine. Hays Med is aware of Dr. Rodriguez's resignation and has ninety days in which to find a suitable substitute or replacement. This is ample time to mitigate their damages, and it is their responsibility to ensure continuity of care at their hospital as they have reasonable notice of Plaintiff's departure.

210.    But the public will also suffer significant harm as this will further reduce access to health care in rural areas.

211.    Specifically, the nearly 5,000 patients that rely on Dr. Rodriguez will be left without a provider, or the required continuity of care.

212.    The public interest clearly calls in favor of ensuring that residents of western Kansas are afforded necessary access to critical services, especially

ones such as chemotherapy that require continuous and ongoing treatment according to a strict regime. Missing even a single treatment can place patients in serious jeopardy.

213.    As the dearth of available hematology and oncology providers already poses significant problems, this will further strain resources and cause broader harm to the public at large.

214.    Finally, it should be noted that the status quo merely provides patients with stability, access to care, and the ability to ensure life saving treatment is available. This is a crucial consideration. However, denial of an injunction with ensure an upheaval for the public, as there is simply no other options for providers that patients may seek. Further, this would disrupt the patient-physician relationship during a crucial time in their treatment regimen.

215.    WHEREFORE Plaintiff prays for Order against the Defendants finding the Covenant not to complete is injurious to the public welfare, unconscionable, and void for public policy reasons. Plaintiff respectfully requests the Court award damages in an amount to be determined at trial; find that the Covenant is unlawful; enter an injunction prohibiting Defendant from enforcing said Covenant; and award any other relief this Court deems just and proper.

WHEREFORE, Plaintiff prays against Defendants for the following judgments:

A.    That the Covenant violates the Sherman Act, Section 1;

B.      That the Covenant violates the Sherman Act, Section 2;

C.      A Declaration that the Covenant is void and unenforceable as a matter of public policy, that it is unconscionable, and that it is injurious to the public welfare in addition to placing an unreasonable restraint on Dr. Rodriguez's ability to practice medicine;

D.      An injunction allowing Dr. Rodriguez to continue to practice medicine in western Kansas during the pendency of this action;

E.      For damages to be decided at trial, including treble damages;

F.      For attorneys' fees pursuant as allowed under Kansas law, and any other appropriate statute;

G.      For costs of this action;

H.      For such other relief as the court may deem just and proper.

## **PLACE OF TRIAL**

216.    In accord with Local Rule 40.2(a), Plaintiffs hereby designate Wichita, Kansas as the place of trial in this matter.

## **JURY DEMAND.**

217.    Plaintiff demands a jury trial on all issues so triable.

Respectfully submitted,


**/s/Christopher J. McGowne**
Christopher J. McGowne, #29056
Craig L. Uhrich, #20618
MCGOWNE UHRICH LLC
222 Center Avenue
Oakley, Kansas  67748
(720) 878-7688
cjmcgowne@gmail.com
craig.uhrich@gmail.com


*Attorney for Plaintiff*